## TREMONT COAL & COKE CO. v. SHIELDS.

(Circuit Court of Appeals, Ninth Circuit. March 1, 1909.)

No. 1,639.

MASTER AND SERVANT (§ 286*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—ACTIONS—QUESTIONS FOR JURY.

In an action by a miner to recover from a coal company for an injury caused by the falling of rock upon him in a tunnel, which he and others were running, when he went in to begin his shift immediately after a blast, where the alleged negligence of defendant consisted in not timbering the tunnel and in not inspecting it before plaintiff went to work, and defendant introduced evidence that the tunnel was in rock which did not need timbers, and which it was not customary to timber, that it was inspected but a few hours before the accident, and that it was the duty of the miners themselves after a blast to sound the walls and remove any rock loosened by the blast, the question of defendant's negligence was one for the jury, and it was error to charge that it was negligent as matter of law.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1010; Dec. Dig. § 286.*]

In Error to the Circuit Court of the United States for the Northern Division of the Western District of Washington.

This was an action for personal injuries, resulting in a verdict for the plaintiff therein, from which judgment the present writ of error was brought by the defendant in the court below.

The plaintiff alleged that he was employed by the defendant in the capacity of what is known as a "hard-rock or quartz miner," and as such was engaged, with other like miners, in running a tunnel in order to reach certain veins of coal; that he and the other miners similarly engaged were working in shifts of eight hours each, two men to a shift, and that plaintiff's regular shift was from 11 o'clock at night to 7 o'clock in the morning; that at 11 o'clock in the night of July 27, 1906, the plaintiff went to work on his shift, in company with the other miner on his shift, and that since the plaintiff's last shift of work, which ended at 7 o'clock in the morning of that day, "considerable digging had been done in the face of said drift, and fresh rock and dirt had been exposed in the walls and overhead, not visible when plaintiff had quit work in the morning, and of which he had no previous knowledge or notice, and which rendered said place of work extremely dangerous and unsafe; that the rock and dirt dug down by preceding shifts had been allowed to accumulate in the drift so as to cover the floor with piles of loose stones and earth, rendering it very difficult to move about in the drift and impossible to escape in the event of caving; that the sides and top of said drift at that point and near there, and especially said freshly exposed portion of the top wall, were wholly unsupported by any sort of timbers or protection against caving and falling, although the same were freshly dug out and unsafe without such timbering and supports, and the drift was further obstructed and rendered unsafe and dangerous to move about in, or to escape from, by reason of the tracks in and along the floor of the drift being blocked up for a long distance with cars that had been allowed to accumulate and stand there, and plaintiff avers that, in all of the aforesaid particulars, the defendant was then and there wholly lacking and negligent in its due, reasonable, and ordinary care and prudence for the safety of plaintiff, and especially in thus failing and neglecting to furnish and to maintain a reasonably safe place for him to work; that within a few minutes after plaintiff went upon duty at the time and place last aforesaid, and before he had time to discover the risk and danger of the aforesaid situation, or to escape therefrom in the obstructed condition of the drift before described, a large and heavy rock in the freshly exposed portion of the wall overhead, near the face of the drift, suddenly caved and fell in upon him, carrying with

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

it a large mass of dirt and stones, and completely crushing and burying him beneath their heavy weight, inflicting the wounds and injuries," for which he sued. The answer of the defendant company put in issue all of the averments of negligence on its part, and as affirmative defenses set up assumption of risks and contributory negligence on the part of plaintiff.

Upon the conclusion of the plaintiff's case, the defendant moved for a nonsuit, which motion was denied, and upon the conclusion of all of the evidence the defendant moved for an instructed verdict in its favor, which motion the court likewise denied. And, when it came to charge the jury, it took from them all consideration of the evidence in respect to the alleged negligence of the defendant in these words:

"Now, one of the essentials of the plaintiff's right of action in this case is the fact that he was injured. That is not controverted. That does not have to be proved. That is a fact in the case. Another of the elements essential to his right of action is that this injury was in consequence of the defendant's negligence—negligence amounting to a breach of duty which the employer owed to him while in the service of the defendant company.

"The plaintiff specifies negligence in a number of particulars. There is a controversy as to whether the defendant was negligent at all, but the plaintiff is not required, in order to make out his case, to prove that the defendant was negligent in all particulars specified. If the case is proved as to one particular specification of negligence, which is sufficient in law to create a liability, it becomes unnecessary for the court and jury to analyze all of the testimony, and determine as to all of the other particulars of negligence.

"Now, when there is a material fact about which there is a controversy, which has been so clearly proved as to really amount to an admission and to be an uncontroverted fact in the case, the court is not required to refer that to the jury, but may determine it as a question of law; and hence in this case the court has assumed to decide, as announced yesterday, that as a matter of law the defendant has been proven to have been negligent in this case. That does not authorize you to assume that the court has determined that this defendant is negligent in all of the particulars, or with all the enormity alleged, but sufficient to constitute a legal liability. I have no objection to making it known to you and to the parties and their attorneys that the negligence which appears so clear in this case as to justify the court in making this ruling is practically confessed by the manner of the defense. The defense in part has proceeded upon the theory that the officers and superintendents of this mine did not know that there was danger at that particular time in the face of the tunnel, knowledge which should have been known, or the defendant should have possessed, if there had been that degree of care in inspection and competency of supervision which was required in operating a mine which is necessarily dangerous. That, in connection with the undisputed testimony in the case, I think justifies the court, and therefore the court assumed the responsibility of deciding that this defendant has been proved to have been negligent by reason of neglect to supervise the work of the employés and to constantly inspect the mines, so as to know as often as the shifts were changed the conditions there, and the degree of danger to which the men going into a place of that kind were exposing themselves in going there.

"Now, that is as far as the court has gone, and it is not necessary for you to go beyond that and determine all of these questions, whether in a mine of this character, a mine of that size, it was a fault on the part of the defendant company not to organize a force classified so as to have muckers and timbermen and miners working according to the established methods of carrying on operations in larger mines. That question you do not need to spend the time to decide. Various other grounds of negligence are alleged. It is not necessary for us to decide whether it was negligence not to support the roof and the walls of this tunnel, cut, as the testimony tends to prove it was, through rock or solid formation.

"Now, in your province of deciding whether the plaintiff shall have a verdict or not, the ruling of the court has simplified the case so that it can be taken up by the jury and decided according to your determination of two principal questions"—which the court proceeded to explain were the questions of contributory negligence and assumption of risks.

Except at the entrance, it was undisputed that the tunnel, so far as it had been constructed at the time of the accident in question, was in sandstone, but the plaintiff and several of the witnesses on his behalf gave testimony tending to show that there were some places in it, more or less soft and dangerous, without timbers.

The witness Hamilton, who worked on the shift from 7 a. m. to 3 p. m., testified, among other things, as follows: "The day Shields was hurt I had worked from 7 o'clock in the morning until 3 in the afternoon, and put in several blasts. We would drill until time to go off, and would load our holes and fire them as we went out, and did not go back to see what the effect of the blast was. Q. Mr. Hamilton, what was the condition of the roof at the point where you were at work when you left there near the breast of the cut? A. I considered it bad. Q. In what respect? A. Danger of caving. Q. Well, I will ask you what the character of that danger was, as to being immediate? A. Well, I considered it dangerous right at the present time. Q. Did you make any investigation in reference to it? A. I looked at it; tried to pry a chunk down that I was afraid of. Q. Well, what was it particularly that you thought was dangerous? A. Well, I was more afraid of a large stone that there was slips around that looked to me like it cut it off, and I was afraid it would fall down; that was before I fired the blast and I tried to pry it down, but could not move it. * * * This rock was from 3 to 3½ feet from the breast of the tunnel. Q. What was the condition of the roof generally around this rock? A. Well, if that rock would stay there, the balance of the rock would stay up I think. Of course, you could see other smaller slips, but in that case this rock acted as a key, and, if this stayed there, the balance would stay. The rock was visible all of my shift, and I worked under it from 7 in the morning. There were no timbering in the tunnel at that point, nor anywhere near there. Q. I will ask you whether or not in your judgment, based upon your experience and observation as a miner, it was a proper and prudent thing to do, for the reasonable safety of the men at work in that tunnel, to have had timbers at any point along the distance that you have described (between the entrance of the tunnel and the place where Shields was hurt)? A. Yes, sir; it was. Q. Why? A. Because it caved many times. We ran through about 20 or 30 feet back from the breast where Mr. Shields was hurt a short vein of coal, and there was soft rock laying next to the coal, and that caved oftentimes in good quantities. Q. That is the point you say that timbers should have been placed? A. Yes, sir; that is one point. Q. Were there other places in that distance of 150 feet that should have been timbered? A. Except on the breast. Q. I will ask you whether or not you ever saw a timber crew at work timbering there? A. No, sir. Q. Do you know whether or not the defendant company had a timber crew? A. I don't. Q. Did you ever see any material for putting in timbering in the mine? A. No, sir. Except some that I put in afterwards. Q. Did you ever hear any of your fellow workers ask for timber? A. I heard my partner say to the foreman, Mr. Wildiz: 'John, there had ought to be some timbers in here.' That occurred while we were working between where we got this coal slip and where Mr. Shields got hurt. No timbers were furnished in reply to this request. Q. Whose duty is it in the mine to investigate the condition of the roof and the walls, with reference to the necessity for timber? A. It is the duty of the foreman, and also the duty of the men working there. If the miner sees a place in the mine he thinks ought to be timbered, he should go to Mr. Wildiz, and it would be Mr. Wildiz' duty either to furnish timbers and instruct the miners to timber it up, or furnish timbermen to do it. It is the duty of the foreman to see to the clearing away of the rock from the face of a tunnel after it has been blasted. I visited the place where plaintiff was injured before any work had been done there the next morning, and found the rock that I had seen in the roof laying on the floor of the tunnel with loose rock under it."

The witness Carlson, who worked on the shift immediately preceding that of the plaintiff, testified, among other things, as follows: "I was employed there when Shields was hurt. I was on the afternoon shift from 3 to 11. Mr. Hamilton and his partner were just ahead of me, and Mr. Shields and Mr. Gillis followed me. The day Shields was hurt I worked from 3 to 11, breaking rock in the tunnel. When I went off duty at 11 o'clock that day, the roof was pret-

ty bad. It needed timber all right. It was not so bad that a man could not work there, but then it was bad enough. It was liable to come down any time. Just before going off that shift, we fired six or seven blasts in the face of the tunnel. The roof was in a bad condition. Not very safe for a man to work there unless it was timbered. Q. I will ask you whether that tunnel was timbered any point from the entrance to the place where the injury occurred. A. The entrance to the tunnel; yes, sir. Q. Were there any timbers at any point between the entrance and the point where this accident occurred? A. There were a few sets. Q. Whereabouts were they? A. They were at the entrance. Q. From that point, a distance of about 150 feet, to where Shields was hurt, were there any? A. No, sir. Q. From your experience in mines I will ask you whether for the reasonable safety of the men it should have been timbered? A. Yes, sir. Q. From the character of the roof in the tunnel at the point where the accident occurred, and the intervening distance between the entrance and where the accident occurred, what ought to have been done that was not done for the reasonable safety of the men working there? A. Timbered; that is the only thing. The timber should have been put in in regular sets, two posts and a cap. During the time that I was at work there, I was not furnished with any timbers, and did not see any about there. I asked Mr. Wildiz for timbers several times, and he said that the timbers would be down there, but I never saw any. I asked for timbers the last shift before Mr. Shields came on the day he was hurt. I wanted to fix up that place where Mr. Shields got hurt. Mr. Wildiz said that timber was not necessary. * * * When I went on duty at 3 o'clock in the afternoon, I noticed a large rock in the roof of the tunnel near the breast, and called the foreman's attention to it. Mr. Wildiz was the foreman. That was before 4 and 5 o'clock. Q. What did he do and say, if anything? A. Well, he sounded the rock, and pronounced it safe. The rock did not look very safe to me. This rock was about 2½ or 3 feet from the breast of the tunnel when I last saw it. There were two seams, and the end of the rock was hanging down. That was what I was afraid of, that it would be liable to drop at any time, and there was water seeping through the seams, and it was cut off in front. The blasting that I did on the last shift would naturally jar the rock, and make it more dangerous. When I came off the shift at 11 o'clock, I saw Mr. Shields and Mr. Gillis in the bottom of the slope, coming down, as I was on my way up. Each shift would drive the tunnel on an average of about eight inches to a foot. I would go in at 3 in the afternoon and drill holes in the rock during the eight hours of my shift, and, when I got through drilling, would put powder in the holes and light the fuse and leave the mine. The rock might have fallen on my shift, but, to the best of my judgment, I did not think it would. If I had believed it would, I would have timbered it. I never saw any timbermen there, and supposed we had to do our own timbering. It was not necessary to take the rock down, but, if it had been taken down, it would be the foremen's place to say so when we notified him."

The witness Gillis was on the same shift with the plaintiff, and he testified, among other things: "I was present when the accident happened to Mr. Shields, and was his partner on that shift. Mr. Carlson and his partner were on the shift immediately preceding us, and Mr. Hamilton and his partner preceded Carlson. The day of the accident Mr. Shields and I went on at 11 p. m. Q. Just explain when you went in the condition you found existing there and what happened? A. I went into the tunnel where we were working and found the roof in very bad shape, at a point about 3½ or 4 feet from the face of the tunnel. I went in a few minutes ahead of Mr. Shields, and was examining that place with my light, when Shields came in, and I told him that this roof looked dangerous, and that he had better proceed to examine it and secure it if possible. And, while I was examining it, Mr. Shields hung his light a little further on the left-hand side of the tunnel, looking in, and turned as I spoke, and said he would go out and get the hammer, meaning an eight-pound hammer, to pound the roof all over. I told him that I had carried in the hammer, and that it was here. Mr. Shields turned around to get the hammer when the roof dropped. A piece of rock dropped and threw Shields down and hit me a little on the head, and threw me over on the side and cut my head, and dazed me, and knocked my lamp out of my cap, and it didn't go out,

and I picked my lamp up, and heard Mr. Shields say: 'For God's sake, take this off from me.' When I staggered up dazed, there was another fall of rock, and I looked around in a dazed condition, and Mr. Shields was under the rock."

On the other side, and in behalf of the defendant company, Wildiz testified as follows: "I am the John Wildiz who has been referred to by the witnesses in this case as having been superintendent for the Tremont Coal & Coke Company at the time Pat Shields was injured. The entrance to that tunnel was about 12 feet, and the rock is a kind of black rock, which is not solid, and that is the reason I had to put three sets of timbers in tiers to hold it up. That is right at the mouth of the tunnel. And, as soon as we got through there, we struck sand rock, solid as a bell all the way through, with the exception of a little seam or water crack that never softened the rock any. In ground like that we had in that tunnel, it never did need any timbers, and never will need any timbers. I have worked in coal mines all my life, going on to 27 or 28 years now. My mining has been confined to coal mines, rock tunnels, and laying track. I started in as a mucker and laid track for many years as boss track layer, and was foreman and superintendent. In driving a tunnel such as this one by blasting, we must expect that some rock or rocks will be jarred loose, and, when the shot goes off, that leaves loose rock. A man has to go there with a pick or certain tools and pull that down and examine as he goes. If a miner knows anything about mining, he will take a pick or certain tools so that he can reach ahead of him as he goes and examine the roof and sides a certain distance from the place where the charge is located. Of course, every miner will expect that something may be loose and not safe for him to go in unless he examines the place or falls, and as he goes with the pick, he can rap and tell what is loose and what is solid. The miner should not go right into the face without making preliminary tests as he proceeds, because they are not safe, for there may be something hanging down that wants to be taken down or secured before going too far, and by going straight in he takes chances certainly, not knowing what may be ahead of him. It is just like if we walk in the dark, we may fall down in a hole. I heard the testimony of Mr. Carlson yesterday that he asked me for timbers on the shift before Shields was hurt. Mr. Carlson did not make such a request of me. Mr. Gillis did not ask me for timbers for a place in this tunnel near the entrance. I never was asked for any timbers there, because we had timbers laying there. I never intended to put in square sets because they would not need them. I was inside foreman at that time, and had charge of the work in the tunnel and control over these men, and whatever was to be done in that tunnel I had the general direction of it. I was last in that tunnel between 3 and 4 o'clock of the same afternoon of the day on which Mr. Shields was hurt, and went clear through the tunnel to the breast where the work was going on, as it is my business to do."

Three other witnesses, Roberts, Marquette, and Morris, testified on behalf of the defendant. Roberts testified, among other things, as follows: "I started in working as a miner when I was a boy 11 or 12 years old and am now 49, and have had about the same experience that Pat Shields has had. I have been through this tunnel. I was last in it about two weeks ago. I examined the formation of the rock at the place where the accident occurred, and from there to the entrance. I regard that as good safe tunnel from the entrance all the way through. The rock had not changed any up to the time I went in there a couple of weeks ago. It was sandstone rock. My experience on the ground has been quite a great deal in both rock and coal. I have seen a good deal of it, and have seen the same kind of work, and I can take anybody to see the same work at the present time in the Wilkerson Coal & Mining Company's mines. They had larger tunnels and larger tunnels that are standing there for years in the same kind of ground, and are just as firm as the day they were put through. This mine is about a half a mile from the defendant's mine. The other tunnels I refer to are not timbered. My past experience shows that they don't timber such work ordinarily. I heard the next day after the accident that there had been a man hurt there, and my partner and I out of curiosity went in to see what kind of a looking place it was. If I was blasting rock in a tunnel, I never go in there until the smoke is cleaned out, and generally take my pick with me and examine the ground as I advance as care-

fully as I can. I take my pick, and tap the roof all around to see if it is solid, or if there has been any shake around there from the shot which I left, and advance that way until I reach the face. If it is solid ground like that was, the rock is liable not to be cut back from the face. Under ordinary circumstances, it is liable to shake a little piece most anywhere. There might be a little piece that a man would overlook. There would be a liability of rock falling from the center as a rule, but would not look for much coming off the sides." The witnesses Marquette and Morris gave similar testimony to that of Roberts.

Blattner & Chester, L. B. Da Ponti, and Shepard & Flett, for plaintiff in error.

Dudley G. Wooten, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). It is not our province any more than it was that of the court below to weigh the conflicting statements of the witnesses upon the question of the alleged negligence on the part of the defendant. That was for the jury to do, under appropriate instructions from the court. The company's superintendent in his testimony, as has been seen, denied that any timbers had been requested of him, asserted that there were timbers on hand for use when needed, that the tunnel, except at the entrance thereto where timbers were placed, was in sandstone, and needed no timbers, and that he had carefully inspected it as late as 3 o'clock of the afternoon preceding the plaintiff's injury. The testimony of the witnesses Roberts, Marquette, and Morris also tended to support the denial of the defendant's alleged negligence. To what extent the jurors were the proper judges.

That question, lying as it does at the foundation of the case, having been taken from the jury by the court below, the judgment must be, and accordingly is, reversed, and the case remanded for a new trial.